**UNPUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

v.

No. 95-5001

AL M. HARB, a/k/a Abdelgader
Mohamed Abuharb, a/k/a Abdul M.
Abuharb,
Defendant-Appellant.

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

v.

No. 95-5010

AL M. HARB, a/k/a Abdelgader
Mohamed Abuharb, a/k/a Abdul M.
Abuharb,
Defendant-Appellant.

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

v.

MOHAMMED HARB,
Claimant-Appellant,

No. 96-1338

and

AL M. HARB, a/k/a Abdelgader
Mohamed Abuharb, a/k/a Abdul M.
Abuharb,
Defendant.

Appeals from the United States District Court
for the Eastern District of Virginia, at Richmond.
Robert E. Payne, District Judge.
(CR-94-21)

Argued: January 31, 1997

Decided: April 11, 1997

Before HAMILTON and LUTTIG, Circuit Judges, and
BUTZNER, Senior Circuit Judge.

_____

Affirmed by unpublished per curiam opinion.

_____

**COUNSEL**

**ARGUED:** Huestis Pratt Cook, III, ROBERT CABELL & ASSO-
CIATES, Richmond, Virginia, for Appellants. John Granville Doug-
las, Assistant United States Attorney, Richmond, Virginia, for
Appellee. **ON BRIEF:** Robert G. Cabell, Jr., ROBERT CABELL &
ASSOCIATES, Richmond, Virginia, for Appellants. Helen F. Fahey,
United States Attorney, Richmond, Virginia, for Appellee.

_____

Unpublished opinions are not binding precedent in this circuit. See
Local Rule 36(c).

_____

**OPINION**

PER CURIAM:

Immediately following the Iraqi invasion of Kuwait, President
Bush issued emergency Executive Orders to forbid trade, transporta-

tion and financial transactions with Iraq. Executive Orders 12722, 12724, <u>implemented by</u> 31 C.F.R. Part 575. Within months of the President's emergency orders, Al M. Harb, a Jordanian-born naturalized citizen of the United States, began exporting technological products to Iraq, via Jordanian companies controlled by Harb's family. As a consequence of this activity, Harb was convicted on twenty-three counts, including violations of the International Emergency Economic Powers Act (IEEPA) and money laundering. Although Harb was only sentenced to eight years imprisonment and forfeiture of $420,028.52 of his ill-gotten gain, he now challenges both his conviction and sentence. We find none of Harb's challenges to be meritorious and therefore affirm his conviction and sentence in full.

I.

In 1990, Harb and his wife Rula Saba Harb (Saba) began an export business under the name Expo International, later to be renamed Virginia International Trade Company (VITCO), while Harb's family operated a collection of companies in Jordan called the Abu Harb Trading Group. Although Harb and Saba frequently represented to their suppliers and manufacturers that the end users of their products would be companies in the Abu Harb Trading Group, communications discovered in Harb's files indicate that the Jordanian companies were often transhipment points for goods intended for Iraq. For example, Harb's files contained direct communications between VITCO and Al Jabouri, the Head of the Commercial Directorate of the General Establishment for Generation and Transmission of Electricity (GEGET), an agency of the Iraqi government. These communications, along with other evidence presented at trial, establish that Harb exported technological products for eventual delivery to Iraq.

On February 26, 1994, United States Customs Service agents arrested Harb and Saba for violating the embargo against Iraq. A jury thereafter convicted Harb on twenty-three counts for, _inter alia_, conspiracy to violate the International Emergency Economic Powers Act, willfully dealing in property intended for exportation to Iraq, willfully engaging in transactions relating to travel by a United States citizen into Iraq, and money laundering. The court found Saba, who chose a bench trial, not guilty on all counts. The court calculated Harb's base offense level at 22 for the IEEPA convictions and 26 for the money

3

laundering counts, and sentenced him to eight years imprisonment. Pursuant to an agreement between Harb and the government to allow the district court to decide all forfeiture issues, the court ordered Harb to forfeit $420,028.52.

II.

Harb challenges the sufficiency of the evidence for his multiple convictions under 50 U.S.C. § 1705(b), which makes it a crime to "willfully" violate any license, order or regulation issued under the IEEPA. It is difficult to fathom how Harb, who operated an export company dealing regularly in the Middle East, could have been unaware that the sales to Iraq violated the embargo accompanying the Gulf War. In any event, there is ample evidence affirmatively establishing that Harb was on notice such conduct was illegal. For example, on April 6, 1991, Commerce Department Agent Donald Lyles interviewed Harb, notified him of the trade embargo against Iraq, and warned him not to entertain price quotations for products destined for Iraq. J.A. at 181. The willfulness of Harb's violations is further evidenced by the great lengths to which he went to conceal the fact that the end users of his exports were in Iraq. Among other things, Harb covered up or obliterated references to Iraq in documents contained in his own files. See, e.g., J.A. at 1197, 1325, 1343, 1476.

Harb argues that, for two reasons, he was unaware of the illegality of his activities. Neither of these is persuasive. First, Harb's argument that he thought GEGET Director Al Jabouri was purchasing goods in his private capacity as head of a Jordanian business is contradicted by Harb's own business records, which show that Jabouri communicated with Harb from his GEGET office via a GEGET telex; that Jabouri sent specifications for an Iraqi government power plant called Al Massaib; and that Jabouri ordered parts with serial numbers identified solely with Iraqi projects. Second, Harb's assertion that he did not intend for his goods to be shipped to Iraq unless approved as humanitarian goods by the United Nations is of no avail, because Harb offers no evidence that he expected his goods to be approved by the United Nations prior to shipment to Iraq, and because United Nations approval would not have legalized the shipments without licenses from the United States Treasury Department.

4

III.

Harb next argues that the district court abused its discretion by permitting Barbara Jones, the U.S. representative on the United Nations Sanctions Committee, to testify that the United Nations had received no applications for approval of humanitarian goods from Harb, his company, or his family's companies in Jordan. Although Jones' testimony does not directly rebut Harb's assertion that applications were submitted to the Jordanian government (which presumably would then submit them to the U.N.), Jones' testimony is clearly relevant to Harb's ultimate argument that he believed the goods would not be shipped to Iraq without United Nations approval. Therefore, the district court in no way abused its discretion in allowing Jones to testify.

Nor did the district court err in denying Harb's motion for a new trial based on an October 19, 1994, memorandum from a Jordanian deputy representative to the United Nations, stating that three applications had been submitted to the U.N. Sanctions Committee in March, 1994 and denied in July of that same year. This evidence could have been discovered with diligent effort prior to trial. Furthermore, there is nothing exculpatory in the memo, because the memo shows that the Jordanian government sent the requests to the U.N. after Harb was arrested and that the applications were rejected. Furthermore, Harb has not even established that the applications in question pertained to the shipments for which he was convicted.

IV.

Harb's remaining arguments all lack merit. The least supportable of his arguments is that his sentence was unwarranted because he did not "evade" "national security controls" under USSG § 2M5.1.* Harb's suggestion that the Executive Orders prohibiting exports to Iraq were foreign policy controls rather than national security controls is untenable, as the orders were clearly both. See Executive Order 12722 ("[T]he policies and actions of the Government of Iraq constitute an unusual and extraordinary threat to the national security and foreign policy of the United States.").

_____

*USSG § 2M5.1 applies because there is no guideline directly addressing Harb's conduct, and § 2M5.1 is the most analogous guideline.

5

The district court's imposition of Harb's prison sentence and subsequent order of forfeiture did not constitute double jeopardy because the two penalties were imposed during the same proceeding. The government moved for a forfeiture order the day the guilty verdict was rendered, and the court ordered forfeiture only two days later. The eighteen-month delay before the forfeiture order was finalized resulted from a need to resolve a third party claim to the forfeited funds.

Finally, we find no reversible error in the district court's reconstruction of an exhibit under F.R.A.P. 10(e), its calculation of the amounts of money laundered, or any other ground raised by Harb in either his original brief or his pro se supplemental brief.

The judgment of the district court is affirmed.

AFFIRMED

6